# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MEDAVANTE, INC., a Delaware corporation, | ) ) ) | |
| | ) | Civil Action No.: |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PROXYMED, INC., a Florida corporation, SCHWARTZ COMMUNICATIONS, INC., a Massachusetts corporation, TRUEBRAND, LLC, a California limited liability company and DOES I through X, inclusive, | ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S BRIEF IN SUPPORT OF
## REQUEST FOR PRELIMINARY INJUNCTION

---

Bradley L. Mitchell, Esq. (BM 1691)
Elliott J. Stein, Esq. (ES 4378)
**STEVENS & LEE**
A Pennsylvania Professional Corporation
600 College Road East
Suite 4400
Princeton, New Jersey 08540
(609) 243-9111

Attorneys for Plaintiff

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 1

LEGAL ARGUMENT ........................................................................................... 7

MEDAVANTE IS ENTITLED TO A PRELIMINARY INJUNCTION ..................................... 7

    1.) MEDAVANTE IS LIKELY TO SUCCEED ON THE MERITS ................................... 8

      A.) The Mark Is Valid And Protectable ......................................................... 9

      B.) The Mark Is Owned By Plaintiff .............................................................. 10

      C.) Defendant's Use Of The Mark Is Likely To Cause Confusion As To The
      Source Of The Goods Or Services ............................................................... 11

          1. Degree of Similarity Between the Marks (Lapp factor 1) ....................... 14

          2. Strength of the Marks (Lapp factor 2) ................................................. 16

          3. Care and Attention of Consumers (Lapp factor 3) .............................. 18

          4. Actual Confusion (Lapp factors 4 and 6) ............................................ 19

          5. Intent of the Defendant (Lapp factor 5) .............................................. 21

          6. Marketing Channels and Similarity of Targets (Lapp factors 7 and 8) ..... 22

          7. Relationship of Goods In The Minds Of Consumers (Lapp factor 9) ....... 23

          8. Other Relevant Factors (Lapp factor 10) ............................................. 24

    2.) MEDAVANTE'S IRREPARABLE HARM .......................................................... 25

    3.) HARM TO PROXYMED ............................................................................. 25

    4.) PUBLIC INTEREST .................................................................................. 27

CONCLUSION ................................................................................................... 28

i

# TABLE OF AUTHORITIES

## CASES

**Page**

A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
   166 F.3d 191 (3d Cir. 1999)......................................................................................... 8

A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
   237 F.3d 198 (3d Cir. 2000)........................................................... 13, 14, 16, 19, 20, 21

Abercrombie & Fitch Co. v. Hunting World, Inc.,
   537 F.2d 4 (2d Cir. 1976)............................................................................................. 9

Bordo Products Co. v. B.A. Railton Co.,
   173 F.2d 981 (Ct. of Customs and Patent Appeals 1949)............................................. 15

Cartier, Inc. v. Three Sheaves Co., Inc.,
   465 F. Supp. 123 (S.D.N.Y. 1979) ............................................................................... 9

Checkpoint Sys. v. Check Point Software Techs., Inc.,
   269 F.3d 270 (3d Cir. 2001)...........................................................................11, 15, 18

Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,
   383 F.3d 110 (3d Cir. 2004)........................................................................................ 25

Commerce National Ins., v. Commerce Insurance Agency, Inc.,
   214 F.3d 432 (3d Cir. 2000)........................................................................................ 12

Country Floors, Inc. v. Gepner,
   930 F.2d 1056 (3d Cir. 1991) ....................................................................................... 9

Dreamwerks Production, Inc. v. SKG Studio,
   142 F.3d 1127 (9th Cir. 1998) ..................................................................................... 22

Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,
   30 F.3d 466 (3d Cir. 1994).............................................................................8, 11, 12, 24

Freedom Card, Inc. v. JP Morgan Chase & Co.,
   432 F.3d 463 (3d Cir. 2005)....................................................... 8, 11, 12, 14, 17, 24, 25

Gucci Am., Inc. v. Daffy's, Inc.,
   354 F.3d 228 (3d Cir. 2003) ........................................................................................ 25

i

## TABLE OF AUTHORITIES (Continued)

**Page**

Hoxworth v. Blinder, Robinson & Co.,
    903 F.2d 186 (3d Cir. 1990) ........................................................................... 7

Instant Air Freight Co. v. C. F. Air Freight, Inc.,
    882 F.2d 797 (3d Cir. 1989) ........................................................................... 7

Interpace Corp. v. Lapp, Inc.,
    721 F.2d 460 (3d Cir. 1983) .......................................................... 14, 16, 19, 22, 24, 25

Kos Pharms., Inc., v. Andrx Corp.,
    369 F.3d 700 (3d Cir. 2004) ........................................................................... 8

Lazzaroni USA Corp. v. Steiner Foods,
    2006 U.S. Dist. LEXIS 20962 (D.N.J. Apr. 10, 2006) ............................................. 8, 25

M&R Marking Sys. v. Top Stamp, Inc.,
    926 F. Supp. 466 (D.N.J. 1996) ....................................................................... 8

Merit Diamond Corp. v. Suberi Bros.,
    1996 U.S. Dist. LEXIS 265 (S.D.N.Y. 1996) ......................................................... 9, 16

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,
    290 F.3d 578 (3d Cir. 2002) ........................................................................... 26

Oburn v. Shapp,
    521 F.2d 142 (3d Cir. 1975) ........................................................................... 8

Opticians Ass'n of America v. Independent Opticians of America,
    920 F.2d 187 (3d Cir. 1990 ) ........................................................................ 25, 27

Palm Bay Imports, Inc. v. Veuve Cliquot Pasardin Maison Fondee En 1772,
    396 F.3d 1369 (Fed. Cir. 2005) ....................................................................... 14

Rick v. Buchansky,
    609 F. Supp. 1522 (S.D.N.Y. 1985) ................................................................... 9

SI Handling Systems, Inc. v. Heisley,
    753 F.2d 1244 (3d Cir. 1985) .......................................................................... 25

S & R Corp. v. Jiffy Lube Int'l, Inc.,
    968 F.2d 371 (3d Cir. 1992) ........................................................................ 7, 25, 27

SL1 640572v11/097459.00002

**TABLE OF AUTHORITIES (Continued)**

<u>**Page**</u>

<u>Salem Commodities, Inc. v. The Miami Margarine Co.</u>,
   244 F.2d 729 (Ct. of Customs and Patent Appeals 1957) .............................................. 15

<u>Skol Company, Inc. v. Olson</u>,
   151 F.2d 200 (Ct. of Customs and Patent Appeals 1945) .............................................. 15

<u>Trovan, Ltd. v. Pfizer, Inc.</u>,
   2000 U.S. Dist. LEXIS 7522 (C.D.CA. 2000) ............................................................... 22

<u>Vuitton v. White</u>,
   945 F.2d 569 (3d Cir. 1991) ......................................................................................... 25

<u>Wrap-On Company, Inc. v. W. R. Grace & Co.</u>,
   470 F.2d 1046 (Ct. of Customs and Patent Appeals 1973) ............................................ 15

**STATUTES**

15 U.S.C. § 1114, *et seq.* ................................................................................................. 8

Lanham Act § 33(a), 15 U.S.C.A. § 1115(a) ........................................................................ 10

**MISCELLANEOUS**

<u>McCarthy on  Trademarks and Unfair Competition</u>, § 11.43 ................................................ 9

iii

## PRELIMINARY STATEMENT

Since 2002 plaintiff MedAvante, Inc. ("MedAvante") has used the unique name "MedAvante" to identify its products and services.  In 2004 the trademark "MedAvante" was registered as a federal trademark on the Principal Register.  As explained more fully below, defendant ProxyMed, Inc. ("ProxyMed") should, pending a final hearing, be preliminarily enjoined from continuing to infringe upon MedAvante's rights in the federally-registered trademark "MedAvante" (the "Registered Trademark").  ProxyMed should be so enjoined because: (1) the Registered Trademark is a valid and legally protectable mark; (2) MedAvante owns the Registered Trademark; (3) ProxyMed's use of the substantially similar images "MedAvant", "MedAvant (and design)" and "MedAvant Healthcare Solutions" (the "Infringing Marks") are likely to create confusion concerning the origin of MedAvante's products and services; and (4) MedAvante will suffer irreparable harm unless preliminary injunctive relief is granted.  This brief is submitted in support of MedAvante's request that this Court, on the return date of the Order to Show Cause, enter an Order restraining ProxyMed from the illegal and tortious activities and conduct described in the Complaint pending the conclusion of these proceedings.

## STATEMENT OF FACTS

MedAvante is a Delaware corporation duly qualified to do business in New Jersey.  See Certification of Amy Ellis ("Ellis Certification"), ¶ 2.  MedAvante's principal place of business is located in Hamilton, New Jersey.  Id.  MedAvante is in the business of providing communication, data analysis and services to pharmaceutical companies, physicians and other medical professionals engaged in medical research and clinical trials.  Ellis Certification, ¶ 4; Certification of Joseph Schmidt ("Schmidt Certification"), ¶ 2.  Presently, MedAvante employs approximately 50 employees, and maintains its corporate office in New Jersey.  Ellis Certification, ¶ 3.

1

Beginning in 2002 MedAvante developed a number of proprietary products and services and adopted the trademark "MedAvante" to describe the source and quality of such products and services. Schmidt Certification, ¶ 3. Today, these products and services include the "MedAvante Centralized Rating Service" ("Rating Service") and the "MedAvante Rater Training Service" ("Training Service"). Id.

The Rating Service is a product unique to MedAvante and is its primary product. Schmidt Certification, ¶ 4. Test sponsors that purchase the Rating Service receive data that is objectively rated. This objective data has several different uses. It is used in clinical trials for drugs being developed to treat disorders in which patient improvement is normally measured by subjective assessment scales, used in the development and validation of new research methodologies and used in the diagnosis of patients. Id. The objective data MedAvante provides in connection with clinical trials through its Rating Service better reflects the effect the drug or regimen is having on the patients participating in the trial, and is more valuable to the test sponsor and participating medical institutions. Schmidt Certification, ¶ 5.

Clinical trials and medical research often require the use of "investigators" at numerous "sites" from which potential patients and data can be drawn. These "sites" consist of hospitals, clinics, universities and offices of individual doctors who must agree to participate in, and bring patients to, the studies. Schmidt Certification, ¶ 6. Once a site commits to participation in a study, the investigator at the site identifies potential candidate patients and, with their consent, begins to treat the patient in accordance with the trial protocol with the drug (or placebo) that is the subject of the study. Schmidt Certification, ¶ 7.

Once a patient is enlisted in a study for a drug or treatment to address a specific disorder (*e.g.*, depression), the individual investigators at the various sites are normally charged with the

2

task of eliciting and rating information from the patients that "quantifies" the effect the drug or regimen is having on the particular disorder the drug or regimen is intended to treat.  Schmidt Certification, ¶ 8.  Historically, test sponsors have had great difficulty normalizing study data that is received from numerous investigators to account for the various subjective styles and methods by which medical professionals observe and record such data.  Schmidt Certification, ¶ 9. MedAvante's proprietary Rating Service solves this problem by providing the test sponsor with a small uniform group of raters using a uniform rating method for all sites involved in a clinical trial. When a customer purchases the Rating Service, MedAvante's remote raters, not the individual site based investigators, gather data about the efficacy of the drug or treatment using standardized interview methods and rating scales.  Schmidt Certification, ¶ 10.  This is accomplished by MedAvante's use of remote communications equipment (*e.g.*, video-conferencing and telephone conferencing equipment) that it places in the doctor's offices, hospitals and other medical institutions to connect the sites to MedAvante's central rating locations in Hamilton, New Jersey and Madison, Wisconsin.  Id.

The clear benefit of the Rating Service to the study sponsor is that the same questions are asked to patients participating in the trials by the same raters, who then apply a uniform system to evaluate the answers that are obtained.  Schmidt Certification, ¶ 11.  As a result, the end-data is more reliable and useful to study sponsors (and others using the study data)  as it has been obtained and filtered through a single specific entity, MedAvante, as compared to data provided by hundreds of different doctors and medical professionals, each using differing methodologies. Id.

When a customer purchases the Rating Service, it immediately identifies MedAvante in its proposed clinical trial protocol to the doctors, hospitals, universities and medical institutions that

are asked to join in the study.  All potential participants and investigators receive this protocol when asked to participate in the trial.  Schmidt Certification, ¶ 12.  It is a very costly and time consuming process for test sponsors to recruit doctors, hospitals, universities and medical institutions to participate in clinical studies.  Individual institutions or investigators may elect not to participate in a proposed trial for numerous reasons, including possible concerns that third parties (and not the local investigators) will perform the actual rating of patients for the test sponsor.  Schmidt Certification, ¶ 13.  Accordingly, it is critical that the hospitals,  physicians and medical institutions that are potential sites have a positive view of MedAvante so that the fact that MedAvante is included in a particular protocol will not lead them to decline participation in the medical research or clinical study.  Schmidt Certification, ¶ 14.

MedAvante's Training Service is also sold to sponsors of studies.  In lieu of providing a group of its employees to rate clinical trial patients, MedAvante trains individual clinicians selected by the test sponsor, *e.g.*, the investigators located at the sites, to use a unified rating methodology.  Although such investigators are more diverse than the small uniform group of raters working for MedAvante, the training in uniform method also serves to help normalize data recorded.  Schmidt Certification, ¶ 15.

Since 2002 MedAvante has invested over $2,000,000 in promoting its products and services that bear the "MedAvante" trademark.  Ellis Certification, ¶ 5.  MedAvante has displayed the "MedAvante" trademark in promoting its products and services on advertising and promotional materials that have been distributed globally.  Ellis Certification, ¶ 6.  MedAvante's investment in its trademark includes development of its training tools, development of its website, publishing and marketing materials, attendance at conferences and significant investment in networking.  Ellis Certification, ¶ 7.

4

On or about February 27, 2002, Peter Tilles, Avik Roy, Amy Ellis and Paul Gilbert as partners (collectively the "Partners") caused an application for registration of the trademark "MedAvante" to be filed with the United States Patent and Trademark Office ("USPTO") in International Class 042 for "Technology consulting, namely, providing technology solutions for conducting clinical trials and/or medical research." Ellis Certification, ¶ 8. On April 6, 2004, Registration No. 2,830,753 for the trademark "MedAvante" (the "Registered Trademark") was issued by the USPTO, and was thereupon placed on the Principal Register. Ellis Certification, ¶ 9, Exhibit "A". On March 1, 2006, the Partners licensed the Registered Trademark to MedAvante. Ellis Certification, ¶ 10. In March, 2006, the Partners conveyed their interest in the Registered Trademark to MedAvante. Ellis Certification, ¶ 11. MedAvante is currently the sole owner of the Registered Trademark and the sole entity permitted to use it. Ellis Certification, ¶ 12.

The Registered Trademark is one that has come to identify the Rating Service and the Training Service and to symbolize the source, high quality and dependability of MedAvante's services. Schmidt Certification, ¶ 17. The Registered Trademark, as well as the associated goodwill it has developed, have become valuable assets of MedAvante. Schmidt Certification, ¶ 18.

Defendant ProxyMed, Inc. ("ProxyMed") provides a variety of products and services to its customers, who consist of doctors, laboratories, pharmacies and insurance companies. See Declaration of John Letko ("Letko Declaration"), ¶ 4.[1] These include, among other things,

---

[1]    The Declaration of John Letko, the CEO of ProxyMed, that was filed in connection with the action Metavante Corporation v. ProxyMed, et al., a case that is presently pending in the Eastern District of Wisconsin, is annexed as Exhibit "1" to the Certification of Bradley L. Mitchell ("Mitchell Certification") that is submitted herewith in support of MedAvante's application.

SL1 640572v11/097459.00002

(1) providing clearinghouse services to physicians to assist them with processing healthcare insurance transactions (Letko Declaration, ¶ 2), (2) conforming physician claims to comply with HIPAA (Letko Declaration, ¶ 3), (3) offering clinical services to physicians labs and pharmacies that allow these entities to electronically transfer information (id.), and (4) operating one of the nation's largest Preferred Provider Organizations ("PPO") through which physicians offer their services at a discount to insurance companies that direct new patients to the doctors.  Letko Declaration, ¶ 2.  As of May 8, 2006, ProxyMed estimated that over 450,000 doctors (and their hospitals and medical institutions) in the United States did business with it either directly or indirectly through affiliation with its PPO network.  Letko Declaration, ¶¶ 16, 19.  ProxyMed conducts its business across the nation, and since adopting the Infringing Marks has begun to use the Infringing Marks on a national basis.  Letko Declaration, ¶ 8.

In or about March, 2006, MedAvante learned that ProxyMed had begun to use the Infringing Marks.  Ellis Certification, ¶ 16.  On or about April 5, 2006, MedAvante served written demand upon ProxyMed that ProxyMed cease using the Infringing Marks, cease using the trade names "MedAvant" and "MedAvant Healthcare Solutions" and abandon the trademark application it has filed in connection with the Infringing Marks.  Ellis Certification, ¶ 17.  ProxyMed has refused to cease its use of the Infringing Marks, to cease its use of the trade names "MedAvant" and "MedAvant Healthcare Solutions" and to abandon its applications.  Ellis Certification, ¶ 18.

On June 8, 2006, the USPTO issued an Office Actions refusing – on a non-final basis – ProxyMed's applications to register the Infringing Marks.  Mitchell Certification, Exhibit 4.  In respect of each of ProxyMed's three (3) applications, the USPTO concluded that registration  of

the proposed marks should be refused because of the likelihood of confusion with the mark "MedAvante".  Id.

ProxyMed's continued infringement of the Registered Trademark is thus likely to cause confusion in the marketplace that will dilute the value of the Registered Trademark and that will cause grave injury to MedAvante's reputation and the good will associated with the Registered Trademark.  Therefore, MedAvante's only adequate protection is to enjoin ProxyMed from continuing its illegal use of the Registered Trademark.

## LEGAL ARGUMENT

## MEDAVANTE IS ENTITLED TO A PRELIMINARY INJUNCTION

Injunctive relief is an extraordinary remedy which should be granted only in limited circumstances.  Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989).  Relief will be granted, however, upon a showing that:

1) the moving party is likely to succeed on the merits;

2) the moving party will suffer irreparable harm without injunctive relief;

3) the defendant will not suffer irreparable harm if injunctive relief is granted; and

4) the public interest will be served by the injunction.

S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 374 (3d Cir. 1992) (citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197-98 (3d Cir. 1990)).

Applying these criteria to the present case and the facts submitted herewith, it is clear that MedAvante is entitled to injunctive relief against ProxyMed's unprivileged infringement and use of its valid trademark.

7

**1.)  MEDAVANTE IS LIKELY TO SUCCEED ON THE MERITS**

To satisfy the first prong of the preliminary injunction test a movant must demonstrate a reasonable probability of eventual success in the litigation.  M&R Marking Sys. v. Top Stamp, Inc., 926 F. Supp. 466, 470 (D.N.J. 1996).  "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt."  Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).  Rather, the movant only needs to establish a *prima facie* showing of reasonable probability of prevailing on the merits.  Id.

MedAvante's claims against ProxyMed in this case arise out of ProxyMed's infringement of a federally registered trademark and violation of the trademark protections contained in the Lanham Act (15 U.S.C. § 1114, *et seq.*).  "The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'"  Kos Pharms., Inc., v. Andrx Corp., 369 F.3d 700, 711 (3d Cir. 2004) (quoting 15 U.S.C. § 1114(1)).  Thus, "the law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion."  Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994).

In order to prove a Lanham Act violation, "a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services."  Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005) (quoting A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F. 3d 191, n. 14 (3d Cir. 1999)); see also Lazzaroni USA Corp. v. Steiner Foods, 2006 U.S. Dist. LEXIS 20962 at *5 (D.N.J. Apr. 10, 2006).

MedAvante can, and will, establish these elements at trial.  Accordingly, MedAvante has a reasonable probability of success on the merits, and MedAvante's request for preliminary injunctive relief should be granted.

**A.)**  <u>**THE MARK IS VALID AND PROTECTABLE**</u>

To prove trademark infringement under the Lanham Act, a plaintiff must first establish that its mark is valid and enforceable.  <u>Country Floors, Inc. v. Gepner</u>, 930 F.2d 1056, 1063 (3d Cir. 1991).

Here, there can be no dispute that the Registered Trademark is MedAvante's valid and enforceable trademark.  On April 6, 2004, the United States Patent and Trademark Office placed the trademark upon the Principal Register (Registration No. 2,830,753).  Ellis Certification, Exhibit "A".  The registration of the Registered Trademark as a federal trademark is *prima facie* evidence that the mark is valid.  <u>See</u> Lanham Act § 33(a), 15 U.S.C.A. § 1115(a).

The federal registration of the Registered Trademark is also *prima facie* evidence that the mark is suggestive or fanciful, not descriptive or generic, so that MedAvante need not prove that the mark has acquired secondary meaning in order to be entitled to protection from infringement. <u>Merit Diamond Corp. v. Suberi Bros.</u>, 1996 U.S. Dist. LEXIS 265 at *9  (S.D.N.Y. 1996) ("The [federal] registration of a trademark 'creates a rebuttable presumption that the mark is suggestive, arbitrary or fanciful rather than merely descriptive, and therefore entitled to federal trademark protection.'" (quoting <u>Rick v. Buchansky</u>, 609 F. Supp. 1522, 1529 (S.D.N.Y. 1985) (citing <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 11 (2d Cir. 1976)); <u>Cartier, Inc. v. Three Sheaves Co., Inc.</u>, 465 F. Supp. 123, 127 (S.D.N.Y. 1979)).  <u>See</u> <u>also</u> <u>McCarthy on Trademarks and Unfair Competition</u>, § 11.43 (identifying this as the position of the "vast majority

of courts").  Accordingly, as a matter of law MedAvante has shown that the Registered

Trademark is both valid and protectable.

### B.)  THE MARK IS OWNED BY PLAINTIFF

MedAvante is the owner of the Registered Trademark.  On or about February 27, 2002,

Peter Tilles, Avik Roy, Amy Ellis and Paul Gilbert as partners (collectively the "Partners") caused

an application for registration of the trademark "MedAvante" to be filed with the United States

Patent and Trademark Office ("USPTO") in International Class 042 for "Technology consulting,

namely, providing technology solutions for conducting clinical trials and/or medical research."

Ellis Certification, ¶ 8.  On April 6, 2004, Registration No. 2,830,753 for the trademark

"MedAvante" (the "Registered Trademark") was issued by the USPTO, and was thereupon

placed on the Principal Register.  Ellis Certification, ¶ 9, Exhibit "A".  On March 1, 2006, the

Partners licensed the Registered Trademark to MedAvante.  Ellis Certification, ¶ 10.  In March,

2006, the Partners conveyed in whole their interest in the Registered Trademark to MedAvante.

Ellis Certification, ¶ 11.  MedAvante is currently the sole owner of the Registered Trademark and

the sole entity permitted to use it.  Ellis Certification, ¶ 12.

Therefore, because the registration of the Registered Trademark as a federal trademark is

*prima facie* evidence that the mark is valid, and the Registered Trademark is owned by

MedAvante, MedAvante has the exclusive right by statute to use the mark in connection with the

services it provides.  See Lanham Act § 33(a), 15 U.S.C.A. § 1115(a).

10

## C.) DEFENDANT'S USE OF THE MARK IS LIKELY TO CAUSE CONFUSION AS TO THE SOURCE OF THE GOODS OR SERVICES

Once it is proven that the plaintiff owns a valid and legally protectable mark the question to be analyzed involves "the delineation and application of standards for the evaluation of likelihood of confusion." Freedom Card, 432 F.3d at 470 (quoting A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d Cir. 2000)).

The Third Circuit has held that:

> A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. The relevant inquiry is not whether consumer confusion is a possibility, but whether confusion is likely.

Freedom Card, 432 F.3d at 470 (citing A & H Sportswear, Inc., 237 F.3d 198 (3d Cir. 2000)).

There are two types of "likelihood of confusion" claims - "direct confusion" claims and "reverse confusion" claims. Typically, trademark infringement cases arise from "direct confusion" claims. In a direct confusion claim, "the new or junior user of the mark will use to its advantage the reputation and goodwill of the senior user by adopting a similar or identical mark." Fisons Horticulture, Inc. v. Vigoro Indus., 30 F.3d 466, 474 (3d Cir. 1994). Thus, in a direct confusion case the "the consuming public may assume that the established, senior user is the source of the junior user's goods." Freedom Card, 432 F.3d at 470 (quoting Checkpoint Sys. v. Check Point Software Techs., Inc., 269 F.3d 270, 301 (3d Cir. 2001)).

In the case at bar, the facts are somewhat different. ProxyMed, the junior user of the mark, is significantly larger in size and market saturation than MedAvante, the senior owner of the Registered Trademark. In this situation the danger to MedAvante is not that the public will confuse ProxyMed with MedAvante, but that the public will confuse MedAvante with ProxyMed.

11

The Third Circuit has characterized situations like the one at bar as a claim of "reverse confusion":

> "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." <u>Fisons Horticulture</u>, 30 F.3d at 474.  Thus, the "junior" user is junior in time but senior in market dominance or size.
>
>> In reverse confusion, the junior user saturates the market with a similar trademark and overwhelms the senior user.  The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter.  The result is that the senior user loses the value of the trademark - its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.
>>
>> Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks.  The logical consequence of failing to recognize reverse confusion would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor.  If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for the trademark as identification of the second user's products.
>
> <u>Fisons Horticulture</u> at 474-75 (citations and internal brackets omitted).
>
> * * *
>
> Thus, "the doctrine of reverse confusion is designed to prevent . . . a larger, more powerful company usurping the business identity of a smaller senior user." <u>Commerce National Ins., v. Commerce Insurance Agency, Inc.</u>, 214 F.3d 432, 445 (3d Cir. 2000).

<u>Freedom Card</u>, 432 F.3d at 471-72 (footnote omitted).

The case at bar is one that involves issues of "reverse confusion."  MedAvante, the owner of the Registered Trademark, is the senior user of the mark.  ProxyMed, the infringing entity, is

the junior user. Because of its size and the nature of its business, ProxyMed comes into regular, everyday contact with hospitals, physicians and companies of all sort involved in the medical profession, including those medical professionals with whom MedAvante must do business. ProxyMed's more prevalent use of the Infringing Marks will, however, almost certainly lead those that come into contact with MedAvante to believe that MedAvante is a part of "MedAvant" (ProxyMed), rather than an independent entity. ProxyMed's use of the Infringing Marks thus threatens to "usurp the business identity" of MedAvante, as the contacts who are exposed to ProxyMed's use of the Infringing Mark "MedAvant" on an daily basis are certain to confuse MedAvante for that entity in cases where they are exposed to the Registered Trademark.

In A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d Cir. 2000) the Third Circuit identified a non-dispositive list of "likelihood of confusion" factors that a court should examine to determine whether likelihood of confusion in the marketplace exists in a situation involving reverse confusion:   The factors are:

      (1)    the degree of similarity between the owner's mark and the alleged infringing mark;

      (2)    the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;

      (3)    the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

      (4)    the length of time the defendant has used the mark without evidence of actual confusion arising;

      (5)    the intent of the defendant in adopting the mark;

      (6)    the evidence of actual confusion;

(7)     whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)     the extent to which the targets of the parties' sales efforts are the same;

(9)     the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)    other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

A & H Sportswear, Inc., 237 F.3d at 234.[2]  In evaluating these factors no one factor is dispositive, and it is not necessary for the plaintiff to prove the existence of all ten factors.  Id.  Rather, the weight to be given each factor will vary with the circumstances of a particular case. Id.  See also Freedom Card, 432 F.3d at 473-74.

### 1.  Degree of Similarity Between the Marks (Lapp factor 1)

The single most important factor in determining likelihood of confusion is mark similarity.  A & H Sportswear, Inc., 237 F.3d at 216 (citing Fisons, 30 F.3d at 476).  Marks are confusingly similar if ordinary consumers would likely conclude that the two products share a common source.  Id.  When evaluating the degree of similarity between the marks, the Court must compare the appearance, sound and meaning of the marks.  Palm Bay Imports, Inc. v. Veuve Cliquot Pasardin Maison Fondee En 1772, 396 F. 3d 1369, 1371 (Fed. Cir. 2005).

---

[2]     While a "reverse confusion" claim differs factually from the more typical "direct confusion" claim, the "likelihood of confusion" factors to be evaluated in a reverse confusion case that the A&H Sportswear Court articulated were first identified in the direct confusion case Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983), and are commonly referred to as the Lapp factors.

14

The similarity between the Registered Trademark "MedAvante" and the Infringing Mark "MedAvant" is self-evident.  ProxyMed has virtually copied MedAvante's Registered Trademark in total, with the exception of the use of the letter "e" at the end of the Infringing Mark.  The spelling is otherwise identical, up to and including the use of a capital "A" in the middle of the word.  The "sight" the marks present to the consumer is thus virtually identical.

The "sound" of the marks is also the same.  Here, both "MedAvante" and "MedAvant" can be pronounced the same.  Similarity in sound alone is sufficient to support a finding of likelihood of confusion.  Wrap-On Company, Inc. v. W. R. Grace & Co., 470 F.2d 1046, 1047 (Ct. of Customs and Patent Appeals 1973); Skol Company, Inc. v. Olson, 151 F.2d 200 (Ct. of Customs and Patent Appeals 1945); Bordo Products Co. v. B.A. Railton Co., 173 F.2d 981 (Ct. of Customs and Patent Appeals 1949); Salem Commodities, Inc. v. The Miami Margarine Co., 244 F.2d 729 (Ct. of Customs and Patent Appeals 1957).

"When the dominant portions of the two marks are the same and the overall impression created by the marks is essentially the same, 'it is very probable that the marks are confusingly similar.'"  Checkpoint Sys. v. Check Point Software Techs., Inc., 269 F.3d 270, 281 (3d Cir. 2001) (further citations omitted).  Here, the marks are virtual replicas of each other.  They appear the same.  They sound alike.  Furthermore, neither mark has an obvious meaning that indicates the nature of the goods and services being sold, and both marks are intended by the users to make consumers think of them when the mark is viewed.  Accordingly, this factor highly favors a finding that likelihood of confusion in the marketplace will exist if ProxyMed is allowed to continue its use of the Infringing Mark.

2. **Strength of the Marks (Lapp factor 2)**

In evaluating the strength of a mark at issue under <u>Lapp</u>, the Third Circuit has directed the examining court to review:  (1) the mark's distinctiveness or conceptual strength, and (2) the mark's commercial strength.  <u>A & H Sportswear, Inc.</u>, 237 F.3d at 221.

The conceptual strength of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the weakest:  "(1) arbitrary or fanciful (such as "KODAK"); (2) suggestive (such as "COPPERTONE"); (3) descriptive (such as "SECURITY CENTER"); and (4) generic (such as "DIET CHOCOLATE FUDGE SODA")."  <u>Id.</u> at 221. Stronger marks receive greater protection.  <u>Id.</u> at 222.

Here, MedAvante's mark falls into the first, and strongest, category.  As a matter of law the registration of the trademark "MedAvante" by the USPTO indicates that the mark is arbitrary or fanciful rather than suggestive or descriptive, and is one that is entitled to federal trademark protection.  <u>See</u>, <u>e.g.</u>, <u>Merit Diamond Corp. v. Suberi Bros.</u>, 1996 U.S. Dist. LEXIS 265 at *9 (S.D.N.Y. 1996).  Accordingly, the Registered Trademark is a mark that is entitled to the greatest protection from infringement under the law.

Furthermore, while the record establishes that MedAvante has made a significant commercial investment in the Registered Trademark,[3] ProxyMed's use of the Infringing Marks threatens to render this investment moot.  In cases involving reverse confusion, "a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark."  <u>A</u>

---

3    Since 2002, MedAvante has invested over $2,000,000 in promoting its Rating Service and Training Service that both bear the "MedAvante" trademark.  Ellis Certification, ¶ 5.

& H Sportswear, Inc., 237 F.3d at 231.  The focus of the court in resolving reverse confusion should thus be the commercial impact of the stronger junior user's mark on the weaker mark of the senior but less dominant user.  Freedom Card, 432 F.3d at 472-73.

Here, the commercial strength of the junior user (ProxyMed) is obvious.  ProxyMed conducts its business across the nation.  As of May 8, 2006, ProxyMed estimated that over 450,000 doctors in the United States did business with ProxyMed either directly or indirectly through affiliation with its PPO network.  See Letko Declaration, ¶ 16.  By ProxyMed's own estimate, this amounts to somewhere between 40% and 66% of the physicians in the United States.  Id.  In addition, ProxyMed has relations with 30,000 pharmacies, 500 laboratories, and over 1,500 payer organizations.  See Mitchell Certification, Exhibit "2".  Finally, since adopting the Infringing Marks ProxyMed has begun to use them on a national basis.  Letko Declaration, ¶ 8.

In comparison, at present MedAvante employs approximately 50 employees and maintains a single corporate office in New Jersey.  Ellis Certification, ¶ 3.  While MedAvante has contact with doctors across the nation through its Rating Service, it is extremely unlikely that these physicians will have been exposed to the services that MedAvante provides, as well as its trademark, unless they have worked with MedAvante in the past.  Therefore, it is obvious in comparing MedAvante to ProxyMed that ProxyMed's commercial strength and advertising reach is much greater than that of MedAvante's, and is virtually certain to reach far more physicians than MedAvante can hope to.  In this case of reverse confusion, this factor favors MedAvante as the senior user trying to protect its mark.

17

### 3.  Care and Attention of Consumers (Lapp factor 3)

When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Checkpoint Sys., 269 F.3d at 284.  Furthermore, where the relevant buyer class is composed solely of professionals, a higher standard of care exists for consumers.  Id. at 285 (further citations omitted).  When the purchasing class is mixed, however, courts do not hold the general class to a higher standard, and instead consider that the standard of care to be exercised will be equal to that of the least sophisticated consumer in the class.  Id. (citing Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 293 (3d Cir. 1991)) (further citations omitted).

In this case, the unique nature of MedAvante's business requires the Court to evaluate this prong from a different perspective than is ordinarily presented in cases involving professionals. While it is true that MedAvante's customers tend to be sophisticated consumers that conduct clinical tests, it is critical to MedAvante's existence that these customers are able to convince the individual investigators that will bring the patients to the clinical trials to agree to participate. This being the case, in order for MedAvante to conduct its business the individual physicians must independently agree to allow MedAvante into each of their respective offices and places of business so that MedAvante can perform its unique rating service.

In this situation, however, the physicians who are being asked to allow MedAvante into their places of business are not acting as sophisticated individuals who are practicing their professional craft (in other words, they are not acting as doctors who are treating their patients). Instead, the physicians, as potential investigators, are being asked to make the decision to ask their patients to participate in the study involving MedAvante, and to have MedAvante act as the rater who will do the analysis of the effectiveness of the particular drug under trial.

18

Thus, the individual physicians are <u>not</u> relying on their professional medical analysis in deciding whether to allow MedAvante to participate in the trial, as this choice has already been made for them by the test sponsor. Rather, the physician is simply deciding whether it will permit MedAvante into its office to perform the patient rating the trial requires, or whether it would rather not participate in the particular trial because of this unique circumstance. In this situation where the doctors are not utilizing their medical training, the physicians should not be treated as sophisticated professional buyers but instead should be evaluated on a lower standard that would apply to any individual in the health care field who regularly has contact with ProxyMed because they are required to process a myriad of claims electronically by way of ProxyMed's business.

When this analysis is done, the fact that ProxyMed's use of the Infringing Marks is likely to cause confusion in the minds of these doctors as to the source of the services to be provided by MedAvante becomes evident, as it is these very physicians that have contact with ProxyMed (now doing business as MedAvant) daily, and the likelihood that these physicians will distinguish "MedAvant" from "MedAvante" when reviewing the written protocol and deciding whether to participate in a trial is remote at best. Therefore, this factor favors a finding that likelihood of confusion will occur if ProxyMed is allowed to continue its use of the Infringing Marks.

### 4.  <u>Actual Confusion (Lapp factors 4 and 6)[4]</u>

Marshalling evidence of actual confusion is difficult. <u>A & H Sportswear, Inc.</u>, 237 F.3d at 233. In the case at bar, ProxyMed has made use of the Infringing Marks for only seven months. Therefore, to date MedAvante has not been advised by its customers of instances of actual confusion in the marketplace that have taken place.

---

4    We include the analysis of the fourth and sixth <u>Lapp</u> factors regarding time period prior to evidence of actual confusion and evidence of actual confusion together in this section.

SL1 640572v11/097459.00002

Nonetheless, persuasive anecdotal evidence of actual confusion exists.  A nationwide search for the term "MedAvante" in the category of healthcare on MSN.com returned the first nine out of eleven contacts for MedAvant (ProxyMed).[5]  Ellis Certification, ¶ 22.  This source of confusion is particularly relevant in the case at bar.  In instances where an investigator has approved MedAvante's participation in the trial, MedAvante will be intimately involved in the management of the trial and individuals at the sites will have to communicate with MedAvante on a regular basis.  Id.  While MedAvante provides the investigators with contact information, the more frequent contact these individuals have with ProxyMed will inevitably lead to confusion and potentially result in lost patients in the trials due to potential communication failures.  As shown, in cases where an individual investigator runs a simple search to obtain MedAvante's contact information, the potential for confusion is obvious.  It is thus clear that an individual who wishes to contact MedAvante faces a great likelihood of being actually confused in its effort to do so and misdirected to ProxyMed due to the fact that the Infringing Mark is virtually identical to the Registered Trademark.

Actual confusion will almost certainly also occur in the marketing of the two companies.  Because of the broad, wide-reaching scope of its business in the medical field, ProxyMed will certainly be in regular contact with MedAvante's potential customers.  This fact is proven by a review of a list of exhibitors at the 2005 American Health Insurance Plan annual convention.  Letko Declaration, Exhibit "B".  ProxyMed was an exhibitor at this conference (id.), and it can be expected that it will be an exhibitor at future conferences (and others like it), except under the name of the Infringing Mark "MedAvant".  Other exhibitors at this conference included, among

---

5    A similar search on another major on-line directory (switchboard.com) returned similar results.  Four contacts were listed in response to a nationwide MedAvante search on this site.  The first three contacts returned were for MedAvant (ProxyMed), and the last was for MedAvante.  Ellis Certification, ¶ 23.

SL1 640572v11/097459.00002

others, Abbott Laboratories, AstraZeneca, Eli Lilly & Company, Merck/Schering-Plough, Pfizer, Sankyo Pharma and sanofi aventis.  All of these companies are MedAvante's potential clients. Schmidt Certification, ¶ 30.  It cannot be disputed that they, and companies like them, will thus be regularly exposed to ProxyMed's use of the Infringing Marks, a fact that is certain to cause actual confusion in these companies as to the distinct nature of MedAvante's business.

Other situations where actual confusion is likely to occur in the future (or may in fact have already occurred) are self-evident.  MedAvante is identified in the protocol stage to the potential physicians and hospitals that are being recruited to participate as investigators in the clinical trial. Considering the volume of physicians in the ProxyMed network (450,000) (Letko Declaration, ¶ 16), it is certain that these very doctors and hospitals are likely to deal with ProxyMed (doing business as MedAvant) on a day-to-day basis.  This being the case, it is extremely likely that the physicians and hospitals will actually confuse MedAvante with ProxyMed, the party it deals with every day.  As a result of this confusion, the physician/investigator will make the determination of whether it wants to participate in a trial with MedAvante based upon its previous dealings with, and perception of, ProxyMed, not MedAvante.  This result will render the significant investment MedAvante has made to date in the Registered Trademark moot, and will vitiate MedAvante's hard-earned, existing goodwill in the marketplace.  Schmidt Certification, ¶ 25.

Therefore, because anecdotal evidence of actual confusion exists and the facts show that actual confusion is likely to occur in the future, this factor weighs in favor of entry of injunctive relief in MedAvante's favor.

### 5.  Intent of the Defendant (Lapp factor 5)

When reverse, rather than direct, confusion is alleged, "'intent to confuse' is unlikely to be present."  A & H Sportswear, Inc., 237 F.3d at 232.  For this reason, it has been held that in cases

involving reverse confusion the element of "intent" is irrelevant.  Trovan, Ltd. v. Pfizer, Inc.,
2000 U.S. Dist. LEXIS 7522 at *64 (C.D.CA. 2000); Dreamwerks Production, Inc. v. SKG
Studio, 142 F.3d 1127 (9th Cir. 1998).  Therefore, this factor does not significantly affect the
Court's analysis of whether likelihood of confusion exists and whether a preliminary injunction
should issue.

### 6.  Marketing Channels and Similarity of Targets (Lapp factors 7 and 8)[6]

The channels of marketing and similarity of targets for the products and services provided
by MedAvante and ProxyMed significantly overlap.  In order to provide the service it markets,
MedAvante does business with pharmaceutical companies, physicians and other medical
professionals engaged in medical research and clinical trials.  Ellis Certification, ¶ 4; Schmidt
Certification, ¶ 2.  Similarly, ProxyMed has stated that its customers consist of doctors,
laboratories, pharmacies and insurance companies.  Letko Declaration, ¶ 4.

The studies that MedAvante targets its services to require the test sponsor to enlist
"investigators" at numerous "sites" from which potential patients and data can be drawn.  Schmidt
Certification, ¶ 6.  These "sites" consist of hospitals, clinics, universities and offices of individual
doctors who agree to participate in, and bring patients to, the clinical trial.  Id.  Individual
institutions or investigators may elect not to participate in a proposed trial for numerous reasons,
including possible concerns that third parties (and not the local investigators) will perform the
actual rating of patients for the test sponsor.  Schmidt Certification, ¶ 13.  Accordingly, it is
critical that the hospitals and individual physicians that are potential sites have a positive view of

---

6    We include the analysis of the seventh and eighth Lapp factors regarding the location of marketing activities
     and similarity of targets together in this section.

MedAvante so that the fact that MedAvante is included in a particular protocol will not lead to sites decline participation in such clinical study.  Schmidt Certification, ¶ 14.

ProxyMed has admitted that at present it does business with over 450,000 physicians in the United States.  Letko Declaration, ¶ 19.[7]  These physicians are *exactly* the same physicians who must be convinced to participate in the clinical trials where MedAvante's services will be utilized.  Because of the nature of its business, ProxyMed has daily contact with these physicians.  Furthermore, ProxyMed has embarked on a national advertising campaign (Letko Declaration, ¶ 8) that is certain to cement its use of the Infringing Marks in the minds of the overwhelming number of physicians it deals with daily.  This being the case, it is clear that the factors involving marketing and similarity of targets weigh heavily in favor of finding likelihood of confusion between the Registered Trademark and the Infringing Marks.

### 7. <u>Relationship of Goods In The Minds Of Consumers (Lapp factor 9)</u>

While it is clear that MedAvante and ProxyMed share the same marketplace in that their targets are identical, the services they sell are not (at least at present).  The risk to MedAvante in this case is not that its customers will come to believe that its services are being "passed off" by ProxyMed, but that its customers come to believe that the unique services provided by MedAvante are actually being provided by the entity that these customers are more familiar with, ProxyMed.  This likely situation renders MedAvante's investment in its Registered Trademark moot, and vitiates the independent goodwill MedAvante has established since it commenced business in 2002.  Therefore, the facts of this reverse confusion case make this factor irrelevant, and the Court need not consider this factor in determining whether a likelihood of confusion exists

---

[7]    According to ProxyMed's own analysis, this accounts for approximately 40-66% of the doctors in the United States.  Letko Declaration, ¶ 16.

herein.  See Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 476 n.11 (3d Cir. 1994)

("The weight given to each factor in the overall picture, as well as its weighing for the plaintiff or

defendant, must be done on an individual fact-specific basis.").

### 8.  Other Relevant Factors (Lapp factor 10)

The Third Circuit has noted that "Lapp factor 10 ["Other Relevant Factors"] is necessarily

transformed in the reverse confusion context to an examination of other facts suggesting that the

consuming public might expect the larger, more powerful company to manufacture both products,

or expect the larger company to manufacture a product in the plaintiff's market, or expect that the

larger company is likely to expand into the plaintiff's market." Freedom Card, 432 F.3d at 481

(citing A & H Sportswear, Inc., 237 F.3d at 234).

Here, MedAvante has shown that for a variety of reasons directly applicable to the Lapp

factors that circumstances exist that indicate confusion is likely if ProxyMed is permitted to

continue its use of the Infringing Marks.  Simply put, the marks at issue are virtually identical, and

ProxyMed's dominant presence in, and daily saturation of, the identical marketplace in which

MedAvante resides makes confusion inevitable.

It is thus plain that if ProxyMed is allowed to continue its use of the Infringing Marks

there is a likelihood that confusion in the marketplace will occur and consumers will come to

believe that MedAvante's services are in fact being provided by ProxyMed.  As a result,

MedAvante will lose the investment and hard-earned good will it has in its Registered Trademark.

MedAvante has thus shown that it is likely to succeed on the merits at trial in this case, and a

preliminary injunction should issue now to stop ProxyMed's wrongful conduct.

**2.)  MEDAVANTE'S IRREPARABLE HARM**

Once a trademark owner demonstrates likelihood of confusion (meaning that it has proved that it is likely to succeed on the merits), the Third Circuit has held that the trademark owner is entitled to injunctive relief.  Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983); Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005).  The reason for this straightforward rule is that the remaining elements of injunctive relief follow evidence of likelihood of confusion as a matter of law.

The Third Circuit has held plainly that "trademark infringement amounts to irreparable injury as a matter of law."  Citizens Fin. Group, Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 125 (3d Cir. 2004) (citing Gucci Am., Inc. v. Daffy's, Inc., 354 F.3d 228, 237 (3d Cir. 2003)); see also Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 196 (3d Cir. 1990 ) ("[W]here the plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course . . . ."); S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992); Vuitton v. White, 945 F.2d 569, 576 (3d Cir. 1991).

MedAvante has provided a strong showing of likelihood of confusion and trademark infringement in this case.  See supra, pp. 11-23.  This being the case, irreparable harm to MedAvante on account of ProxyMed's infringement is presumed, and MedAvante's request for injunctive relief should be granted.

**3.)  HARM TO PROXYMED**

Only after the Court determines that the first two prongs of the test for injunctive relief have been met will it then consider the third and fourth factors.  Lazzaroni USA Corp. v. Steiner Foods, 2006 U.S. Dist. LEXIS 20962 at *4 (D.N.J. Apr. 10, 2006) (citing SI Handling Systems,

25

<u>Inc. v. Heisley</u>, 753 F.2d 1244, 1254 (3d Cir. 1985)).  Here, MedAvante has satisfied the first two

prongs of the test for injunctive relief.  <u>See</u> <u>supra</u>, pp. 7-24.

      Similarly, the third factor follows as ProxyMed will not suffer irreparable harm if a

preliminary injunction is issued.  The Third Circuit has held that "[t]he injury a defendant might

suffer if an injunction were imposed may be discounted by the fact that the defendant brought that

injury upon itself."  <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer</u>

<u>Pharms. Co.</u>, 290 F.3d 578, 596 (3d Cir. 2002).  Here, MedAvante's trademark application was

more than three years old at the time ProxyMed adopted the Infringing Marks, and was registered

with the USPTO approximately 20 months prior to the time that ProxyMed began use of the

Infringing "MedAvant" Mark.  An industry standard Thomson CompuMark search would have

plainly indicated to ProxyMed that the MedAvante mark existed and that the proposed

"MedAvant" mark under consideration by ProxyMed would infringe on that mark.[8]  Nonetheless,

ProxyMed chose to ignore this fact, and charged forward with its name change despite the

infringing character of its chosen mark and the risks associated with making that choice.

ProxyMed thus appears to have brought any injury it might suffer as a result of an injunction upon

itself by using the infringing marks notwithstanding the fact that MedAvante's ownership of the

marks was a matter of public record.  Therefore, it is clear that no legal basis exists that would

support any claim by ProxyMed that the harm it would suffer if an injunction is issued outweighs

the benefits of that injunction and the continued harm that will be suffered by MedAvante if

ProxyMed is allowed to continue its use of the infringing marks.

---

[8]    A copy of relevant portions of a June 8, 2006 Thomson CompuMark Trademark Research Report for the
term "MedAvant" is annexed to the Mitchell Certification as Exhibit "3".

**4.)  PUBLIC INTEREST**

The Third Circuit has identified the relevant public interest in a trademark infringement case as the "right of the public not to be deceived or confused."  See Opticians Ass'n of America, 920 F.2d 187, 197 (3d Cir. 1990).  Because of this, "[w]here a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest."  S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992).  Therefore, in situations where the plaintiff has shown that a likelihood of consumer confusion exists, the public interest factor militates in favor of granting the injunction.  Id.

In the case at bar, MedAvante has obtained a valid trademark that ProxyMed continues to violate despite MedAvante's request that it cease and desist from its infringing activity.  In this circumstance, it is clear that the public interest weighs in favor of an injunction, as failure to grant the injunction would amount to tacit approval of the infringing conduct, and would undermine the purpose and intent of the trademark laws.  Accordingly, the public interest factors in this case weigh heavily in favor of the court enjoining ProxyMed's infringing conduct.

27

## CONCLUSION

The required elements for injunctive relief have been satisfied.  MedAvante has shown that it is likely to succeed on the merits of its trademark infringement claim, and that it will suffer irreparable harm if ProxyMed's infringing conduct is not enjoined.  In addition, granting the requested injunction is consistent with the balance of equities as well as the public interest, since public policy dictates that one business should not be permitted to usurp another's good will and commercial advantage.  Therefore, it is respectfully submitted that this Court should enter the requested Order to Show Cause, and that on the return date thereof should enjoin ProxyMed from advertising, marketing, selling and distributing materials including their imitation mark pending the conclusion of these proceedings.

Respectfully submitted,

STEVENS & LEE
A PA Professional Corporation

*s/ Bradley L. Mitchell*

_____
By:  Bradley L. Mitchell, Esq. (BM1691)
600 College Road East
Suite 4400
Princeton, New Jersey 08540
(609) 243-9111
Attorneys for Plaintiff

SL1 640572v11/097459.00002