<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MEDAVANTE, INC.,                  :
                                 : CIVIL ACTION NO. 06-3248 (MLC)
        Plaintiff,               :
                                 :     **MEMORANDUM OPINION**
        v.                       :
                                 :
PROXYMED, INC., et al.,          :
                                 :
        Defendants.              :
_____:

<u>**COOPER, District Judge**</u>

Plaintiff, MedAvante, Inc. ("MedAvante"), moves to preliminarily enjoin defendant ProxyMed, Inc. ("ProxyMed")[1] from directly or indirectly violating the Lanham Act, 15 U.S.C. § ("Section") 1051, <u>et seq.</u>, by, <u>inter alia</u>, using the mark "MedAvant" (the "Mark") "in any advertising, marketing, or other materials or things of any sort whatsoever." (Dkt. entry no. 8.) MedAvante contends that ProxyMed's use of the Mark infringes upon its rights in the federally registered trademark "MedAvante" (the "Registered Mark") because (1) the Registered Mark is a valid and protectable mark, (2) MedAvante owns the Registered Mark, and (3) ProxyMed's use of the Mark is likely to create confusion in the marketplace. (Pl. Br., at 1.) Thus, MedAvante contends that ProxyMed should be preliminarily enjoined, pending a trial on the

_____

[1] Although ProxyMed now operates a majority of its business under the tradename "MedAvant Healthcare Solutions", this Court will refer to it as ProxyMed for purposes of rendering this opinion in order to avoid any confusion between it and MedAvante.

merits, from continuing to use the Mark because MedAvante will suffer irreparable harm if the injunction is not granted.  (Id.)  The Court has considered the papers submitted by the parties and heard oral argument on September 25, 2006.  The Court hereby issues its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure ("Rule") 52.  For the reasons stated herein, the Court will grant the motion.

**BACKGROUND AND FACTUAL FINDINGS**

**I.   MedAvante**

MedAvante is a Delaware corporation with its principal place of business in Hamilton, New Jersey.  (Id.)  MedAvante provides "communication data analysis and services to pharmaceutical companies, physicians and other medical professionals engaged in medical research and clinical trials."  (Id.)  It has approximately fifty employees.  (Id.)

MedAvante adopted the Registered Mark in 2002 with the intended purpose of describing the source and quality of its products and services, including the MedAvante Centralized Rating Service ("Rating Service") and the MedAvante Rater Training Service ("Training Service").  (Id. at 2.)  The Rating Service provides objective data that can be used for clinical drug trials, the development and validation of new research methodologies, and patient diagnosis.  (Id.)  When a customer purchases the Rating Service, it identifies MedAvante in the

proposed clinical trial protocol that it sends to the doctors, hospitals, universities, and medical institutions that it is asking to participate in a particular clinical trial or study. (Id. at 3-4.)  MedAvante places video-conferencing, telephone conferencing, and other types of remote communications equipment in the doctors' offices, hospitals, and medical institutions that agree to participate in a particular clinical trial or study in order to connect these institutions to MedAvante's central rating locations in Hamilton, New Jersey and Madison, Wisconsin.  (Id. at 3.)  MedAvante's raters, who are not the actual site-based investigators, gather data at the central rating locations concerning a drug or treatment's efficacy using standardized methods and rating scales.  (Id.)  Thus, the Rating Service uses a small uniform group of raters employing a uniform rating method for all sites involved in a clinical trial or study.  (Id.)  The "end-data is more reliable and useful to study sponsors (and others using the study data) as it has been obtained and filtered through a single specific entity, MedAvante, as compared to data provided by hundreds of different doctors and medical professionals, each using differing methodologies."  (Id.)

MedAvante also sells its Training Service to clinical trial and study sponsors.  (Id. at 4.)  The Training Service teaches individual clinicians and others, who will serve as the on-site investigators for the clinical trial or study, to use a unified

3

rating methodology.  (Id.)  Because the on-site investigators are more diverse than the small, uniform group of raters MedAvante employs to review the data gathered, the Training Service helps to normalize the data that is recorded.  (Id.)

Peter Tiles, Avik Roy, Amy Ellis, and Paul Gilbert (the "Partners") applied for registration of the trademark "MedAvante" with the United States Patent and Trademark Office ("USPTO") on February 27, 2002.  (Id. at 5.)  On April 6, 2004, the USPTO issued the Partners Registration No. 2,830,753 for the Registered Mark.  (Id.)  The Partners conveyed their interest in the Registered Mark to MedAvante in March 2006.  (Id.)  MedAvante is currently the sole entity permitted to use the Registered Mark. (Id.)  Thus, MedAvante has included the Registered Mark on its globally distributed advertising and promotional materials.  (Id. at 4.)  It has invested over $2,000,000 in promoting its products and services that bear the Registered Mark.  (Id.)

## II.  ProxyMed

ProxyMed is a Florida corporation that provides a variety of healthcare-related products and services, including (1) technology for pharmacies, (2) clearinghouse services that assist physicians with processing healthcare insurance transactions, and (3) a national Preferred Provider Organization ("PPO").  (Id. at 5-6; Def. Br., at 5.)  ProxyMed estimated that it does business with over 450,000 doctors in the United States either directly or through the PPO.  (Pl. Br., at 6.)

4

ProxyMed's claims processing service assists health care providers with the submission of health insurance claims. (Def. Br., at 6.) Specifically, ProxyMed ensures that differently styled submissions are modified and converted into a form the insurance companies can easily process. (Id.) This claims processing service is purely administrative, and thus, does not relate in any way to clinical care, medical research, or clinical trials. (Id.)

ProxyMed's PPO, which is called NPPN, is a network of doctors that offer discounts on their services to insurance companies that refer them new patients. (Id. at 5, 6.) The PPO is available to insurance carriers, third-party administrators, self-insured employers, and union groups. (Id. at 6.) The PPO is not involved in clinical research or clinical trials. (Id. at 7.) It involves only the application of discounts to participating parties' insurance claims. (Id.)

ProxyMed also sells "Prescribe" software, which enables medical providers to electronically submit prescriptions to participating pharmacies. (Id. at 8.) Similarly, ProxyMed's Laboratory Services Division provides electronic equipment and software to laboratories, which allows the laboratories to electronically send test results to a medical provider's office. (Id. at 7.) The laboratories themselves place ProxyMed's equipment and software in the medical providers' offices, and

ProxyMed's Mark usually does not appear anywhere on these products.  (<u>Id.</u>)  Thus, ProxyMed does not have any direct contact with the medical providers that use its Laboratory Services Division products.  (<u>Id.</u> at 8.)

ProxyMed was re-branded "MedAvant Healthcare Solutions" on December 5, 2005.  (<u>Id.</u> at 9.)  The purpose of the re-branding was "to unify the company's business units under one name and create a greater sense of purpose among their employees."  (<u>Id.</u>)  ProxyMed retained the marketing and branding firm, defendant TrueBrand, LLC ("TrueBrand"), and a public relations firm, defendant Schwartz Communications, Inc. ("Schwartz"), and "went to great lengths to find a unique mark" that would distinguish it from its competitors.  (<u>Id.</u>)  ProxyMed, TrueBrand, and Schwartz conducted marketing research before compiling a list of potential new names, and ultimately chose the Mark.  (<u>Id.</u> at 9-10.)  ProxyMed was aware of MedAvante when it made its decision to adopt the Mark, but believed the companies had different business models and different customers.  (<u>Id.</u> at 10.)  ProxyMed was drawn to the combination of "Med", which "has a root meaning of 'to take appropriate measures' as well as its more apparent reference to the medical community", and "Avant", which is an old French word meaning "before a group or movement".  (<u>Id.</u>)

6

**III. Events Preceding Commencement of this Action**

MedAvante learned that ProxyMed was using the Mark in March 2006. (Pl. Br., at 6.)  On April 5, 2006, MedAvante sent ProxyMed a letter demanding that ProxyMed cease using the Mark, cease using the trade names "MedAvant" and "MedAvant Healthcare Solutions", and abandon the trademark application it had filed with the USPTO with respect to the Mark. (Id.)  ProxyMed refused to adhere to MedAvante's demands. (Id.)  Nevertheless, on June 8, 2006, the USPTO issued its "Office Actions" denying, on a non-final basis, ProxyMed's application to register the Mark because the Mark could be confused with MedAvante's Registered Mark. (Id.)  Thereafter, MedAvante commenced this action against ProxyMed, TrueBrand, and Schwartz on July 18, 2006, alleging, inter alia, violations of the Lanham Act. (Compl.)  The filing of the complaint was accompanied by MedAvante's request for preliminary injunction that is the subject of this Memorandum Opinion. (See dkt. entry nos. 2-5, 7-9, 12-19, 21-25.)

## CONCLUSIONS OF LAW

MedAvante asserts that ProxyMed's use of the Mark constitutes infringement of its Registered Mark. (Pl. Br., at 1.)  MedAvante further asserts that ProxyMed's continued infringement of its Registered Mark will (1) likely cause confusion in the marketplace, (2) dilute the value of the Registered Mark, and (3) injure MedAvante's reputation and the

good will associated with the Registered Mark.  (Id. at 7.)
ProxyMed argues that confusion is unlikely because the parties
have completely distinct customer bases and products and operate
in separate areas of the healthcare industry.  (Def. Br., at 2-
3.)  ProxyMed notes that while it targets pharmacies,
laboratories, medical providers, and payer organizations,
MedAvante's customers are global pharmaceutical companies.  (Id.
at 4.)  Accordingly, ProxyMed argues that (1) MedAvante cannot
establish a substantial likelihood of success on the merits,
which would entitle it to injunctive relief, and (2) imposition
of a preliminary injunction would injure ProxyMed because, among
other reasons, it would forever lose the Mark and another re-
branding effort would damage its good will in the industry.  (Id.
at 5.)  Nevertheless, the Court finds that MedAvante has
satisfied the elements of a preliminary injunction such that its
requested relief is warranted.  The findings and conclusions set
forth in this opinion are preliminary only, based upon the state
of the record at this stage in the litigation.  See Fed.R.Civ.P.
65(a).  The parties have preserved all rights to present their
disputes to a fact-finder for eventual adjudication on the
merits.

## I.    Legal Standards

### A.    Preliminary Injunctions

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (citations omitted).  To obtain such interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of irreparable harm absent the injunction.  Id. Thus, in determining whether to issue a preliminary injunction, the Court must consider whether (1) the movant has shown a reasonable probability of success on the merits, (2) the movant will be irreparably injured by denial of the relief, (3) granting the preliminary relief will result in even greater harm to the nonmoving party, and (4) granting the preliminary relief is in the public interest. ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (citations and quotations omitted); see AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (citations and quotations omitted).  The Court should issue an injunction "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." Id. (citations omitted).

9

### 1.   Reasonable Probability of Success on the Merits

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982).  In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits."  Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

### 2.   Irreparable Injury

"Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir. 2004).  However, inexcusable delay in seeking a preliminary injunction may defeat a movant's assertion of irreparable harm.  Id. at 726-27.

### 3.   Harm to Nonmoving Party

The Court must also analyze whether the defendant will suffer irreparable harm if the preliminary injunction is granted. Id. at 727.  If the Court finds that such temporary relief may irreparably harm the defendant, then it must "balance the hardships" to ensure that the injunction does not harm the defendant more than denial of the injunction would harm the

plaintiff.  Id. (noting in trademark infringement action that court should balance hardships to ensure that issuance of injunction would not harm infringer more than denial would harm original mark owner). The injury a defendant might suffer if an injunction is granted should be discounted if there are any facts indicating that the defendant brought the injury upon himself or herself.  Id. at 728.  Further, "[i]rreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it."  Id. at 727.  Thus, the Court should not consider financial damages when deciding whether to grant an injunction. Id. at 728.

### 4.   The Public Interest

The public interest will almost always favor the plaintiff, if he or she demonstrates both a likelihood of success on the merits and irreparable injury.  AT&T Co., 42 F.3d at 1427 n.8.

### B.   Trademark Infringement

The Lanham Act prohibits the commercial use of any "reproduction, counterfeit copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a)

11

(discussing trademark infringement).  Further, Section 43(a)[2] of

the Act provides:

> Any person who, on or in connection with any goods or
> services, . . . uses in commerce any word, term,
> symbol, or device, or any combination thereof, or any
> false designation of origin, false or misleading
> description of fact, or false or misleading
> representation of fact, which–
>> (A) is likely to cause confusion, or to cause
>> mistake, or to deceive as to the affiliation,
>> connection, or association of such person with
>> another, or as to the origin sponsorship, or
>> approval of his or her goods, services or
>> commercial activities by another person
>> . . . .
> shall be liable in a civil action by any person who
> believes that he or she is or is likely to be damaged
> by such act.

15 U.S.C. § 1125(a)(1) (discussing unfair competition).  To

prevail on a trademark infringement or unfair competition claim

under the Lanham Act, the plaintiff must show that (1) the mark

is valid and legally protectable, (2) the plaintiff owns the

mark, and (3) the defendant's use of a similar mark is likely to

create confusion concerning the origin of the plaintiff's goods

or services.  Freedom Card, Inc. v. J.P. Morgan Chase & Co., 432

F.3d 463, 470 (3d Cir. 2005); see Kos Pharm., Inc., 369 F.3d at

708-09; Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d

466, 472 (3d Cir. 1994).  Validity and legal protectability are

---

[2] Before the Lanham Act was codified, the contents of
Section 1125(a) appeared in Section 43(a) of Public Law 79-489.
See 79 Pub.L.No. 489, 60 Stat. 427 (1946).  As a result, this
provision is commonly referred to as Section 43(a) of the Lanham
Act.

proven, if a mark was federally registered and placed upon the principal register.  See 15 U.S.C. § 1115(a).

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark."  Freedom Card, Inc., 432 F.3d at 470.  A plaintiff can assert that there is a likelihood of "direct confusion" or a likelihood of "reverse confusion".  Id.  A direct confusion claim arises when "a junior user of a mark attempts to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark."  Id.  In contrast, reverse confusion arises "when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services."  Id. at 471.  Thus, in a case involving reverse confusion, the junior user overwhelms the senior user, and the public eventually assumes that the senior user's products are either the junior user's products or that the senior user is somehow directly connected to the junior user.  Id.  The result of reverse confusion is that "the senior user loses the value of the trademark - its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets."  Id. (citations omitted).

13

The Third Circuit has adopted a non-exhaustive list of factors to consider when evaluating whether likelihood of confusion exists in a reverse confusion case. Id. at 473; Kos Pharm., Inc., 369 F.3d at 709.[3] The factors are (1) the degree of similarity between the owner's mark and the allegedly infringing mark, (2) the strength of the two marks, (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase, (4) the length of time the defendant used the mark without evidence of actual confusion arising, (5) the defendant's intent in adopting the mark, (6) any evidence of actual confusion, (7) whether the goods, competing or not competing, are marketed through the same channels of trade, and advertised through the same media, (8) the extent to which the targets of the parties' sales efforts are the same, (9) the relationship of the goods in the minds of consumers, and (10) other facts suggesting that the public might expect the larger more powerful company to (i) manufacture both products, (ii) manufacture a product in the plaintiff's market, or (iii) expand into the plaintiff's market. Freedom Card, Inc., 432 F.3d at 473-74; Kos Pharm, Inc., 369 F.3d at 709. The Court

---

[3] These factors were originally set forth in Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). As a result, they are commonly referred to as the "Lapp factors". See Kos Pharm., Inc., 369 F.3d at 709. However, the Lapp factors are analyzed slightly differently when reverse confusion is at issue. Freedom Card, Inc., 432 F.3d at 472.

14

must rely on those factors that are appropriate to the given situation.  Kos Pharm, Inc., 369 F.3d at 709.  None of these factors is determinative.  Id.  Nevertheless, the "single most important factor in determining likelihood of confusion is mark similarity."  Id. at 712-13.  Marks are confusingly similar if ordinary persons would likely conclude that they share a common source, affiliation, connection or sponsorship.  Id. at 713.

## II.  Legal Standards Applied Here

### A.  Reasonable Likelihood of Success on the Merits

MedAvante alleges that ProxyMed (1) infringed its Registered Mark, (2) infringed its common law trademarks and trade names, (3) used, without MedAvante's consent, a reproduction, counterfeit, copy, or colorable imitation of the Registered Mark in violation of Section 1114, (4) used a false designation of origin or a false and misleading description of its goods and services that is likely to cause confusion, cause mistake, or deceive in violation of Section 1125(a), (5) engaged in unfair competition, and (6) engaged in unfair trade practices.  (Compl.) The Court finds that MedAvante has demonstrated a reasonable likelihood of success on the merits with respect to its claims.

### 1.  MedAvante Owns the Valid and Legally Protectable Registered Mark

ProxyMed does not dispute that MedAvante owns the Registered Mark or that the Registered Mark is valid and legally protectable.  The USPTO issued Registration No. 2,830,753 to the

15

Partners for the Registered Mark on April 6, 2004 and placed the Registration Number on the principal register.  (Pl. Br., at 5.) Thereafter, the Partners conveyed their interest in the Registered Mark to MedAvante, which is currently the sole owner of the Registered Mark and sole entity permitted to use it. (Id.).  The federal registration of a trademark and placement of the registration number upon the principal register constitutes prima facie evidence that (1) the trademark is valid and enforceable, (2) the registrant owns the trademark, and (3) the registrant has the exclusive right to use the trademark.  15 U.S.C. § 1115(a).  Thus, MedAvante has established the first two elements of its trademark infringement and unfair competition claims under the Lanham Act.

> ## 2.    ProxyMed's Use of the Mark is Likely to Cause Confusion

This action involves reverse confusion because the larger, more powerful company, ProxyMed, is allegedly infringing the trademark of the smaller, less powerful senior owner, MedAvante. See Freedom Card, Inc., 432 F.3d at 471 (noting that reverse confusion occurs when "'junior' user is junior in time but senior in market dominance or size").  We find that ProxyMed's Mark is substantially similar to MedAvante's Registered Mark, and that it is likely to create confusion concerning the origin of MedAvante's products and services.  We further find that consumers viewing MedAvante's Registered Mark will likely assume

16

that the products and services it represents are associated with
ProxyMed.  See id. at 470.

### a.  Degree of Similarity

The degree of similarity between the marks at issue is the
most important Lapp factor.  Fisons Horticulture, Inc., 30 F.3d
at 476.  "[I]f the overall impression created by marks is
essentially the same, 'it is very probable that the marks are
confusingly similar.'"  Id. at 478 (citations omitted).  Here, the
overall impression created by MedAvante's Registered Mark and
ProxyMed's Mark are essentially the same.  Both marks are spelled
exactly the same, except that ProxyMed does not use the letter
"e" at the end of its Mark.  Further, both marks include a
capital "A" in the middle ("MedAvante" and "MedAvant") and both
may be pronounced the same way.

ProxyMed asserts that its Mark and the Registered Mark are
not substantially similar because they are displayed differently.
(Def. Br., at 16-17.)  MedAvante displays the Registered Mark in
thick text, using dark, bold print, and italicizes the "Avante"
portion.  (Id. at 17.)  ProxyMed uses a finer font and softer
colors, and often places a logo above the Mark and the tag line
"Subjective → Objective" beneath the Mark.  (Id.)  However, the
fact that there are some differences in what two marks suggest is
not enough to conclude that they are not confusingly similar.
Fisons Horticulture, Inc., 30 F.3d 477.  "[T]rademark

17

infringement does not require exact copying of the trademark as
the owner uses it. . . . [Instead, marks] are confusingly similar
if ordinary consumers would likely conclude that [they] share a
common source, affiliation, connection or sponsorship." Id.
Thus, because the Mark and the Registered Mark are nearly
identical and may be pronounced the same, this factor indicates
that marketplace confusion is likely if ProxyMed is permitted to
continue using the Mark.

### b.   Strength

The strength of the two marks at issue also indicates that
confusion is likely.  In evaluating the strength of a mark, the
Court examines the mark's (1) distinctiveness or conceptual
strength (i.e., the mark's inherent features), and (2) commercial
strength (i.e., marketplace recognition of the mark).  Freedom
Card, Inc., 432 F.3d at 472.  The conceptual strength of a mark
is measured by classifying the mark into one of the following
four categories ranging from strongest to weakest, with strong
marks receiving the greatest protection: "(1) arbitrary or
fanciful (such as 'KODAK'); (2) suggestive (such as
'COPPERTONE'); (3) descriptive (such as 'SECURITY CENTER'); and
(4) generic (such as 'DIET CHOCOLATE FUDGE SODA')." Id.
Arbitrary or fanciful marks neither describe nor suggest anything
about the product; suggestive marks require "customer
imagination, thought or perception" to determine what the product

is; descriptive marks describe the intended purpose, function, use, size, or the class of users of the goods; and generic marks "function as the common descriptive name of a product class." Checkpoint Sys., Inc. v. Check-point Software Techs., Inc., 269 F.3d 270, 282 (3d Cir. 2001) (citations omitted).  The first two categories are deemed "inherently distinctive", and thus, are entitled to the highest level of protection.  Fisons Horticulture, Inc., 30 F.3d at 478.  The commercial strength of a mark is measured by comparing the commercial strength of the junior user to that of the senior user and determining whether the junior user has employed a marketing or advertising campaign, which saturated public awareness of the junior user's mark. Freedom Card, Inc., 432 F.3d at 472.

ProxyMed argues that the Registered Mark is descriptive because "it conveys an immediate idea of the characteristic of the goods and/or services provided."  (Def. Br., at 19.)  This Court disagrees, however, and finds that it is not immediately apparent from the combination of "Med", which is often an abbreviation for "medical", with "Avante", which is not commonly used and is not necessarily an English word, what products and services MedAvante provides.  Instead, MedAvante's Registered Mark falls into either (1) the arbitrary or fanciful category because it neither describes nor suggests anything about MedAvante's products and services, or (2) the suggestive category

19

because MedAvante's customers must use their imagination or thought to determine what products or services it refers to. Accordingly, the Registered Mark is inherently distinctive and deserves the highest level of protection.  Thus, the Registered Mark's conceptual strength weighs in favor of MedAvante.

The commercial strength of the two marks also weighs in favor of MedAvante.  ProxyMed is a large, national company with annual revenues of approximately $70 million with respect to its claims processing service alone.  (Lettko Aff., at ¶ 7.)  Over 140,000 doctors use ProxyMed for claims processing and over 450,000 doctors use it either directly or indirectly through affiliation with its PPO network.  (Mitchell Cert., Ex. 1, Lettko Decl., at ¶ 16.)  This means that ProxyMed conducts business with between 40 and 66 percent of the 678,000 doctors in the United States.  (Id.; Pl. Br., at 17.)  Further, ProxyMed "connect[s] to more than 450,000 providers, 30,000 pharmacies, 500 laboratories, and over 1,500 payer organizations."  (Mitchell Cert., Ex. 2, at 1.)  In contrast, MedAvante is a much smaller company that has only fifty employees and one corporate office.  (Pl. Br., at 2.)  Thus, ProxyMed's commercial strength clearly outweighs MedAvante's commercial strength.

ProxyMed hired both a branding firm and a public relations firm and made a "significant" investment in the marketing and branding of the Mark.  (Def. Br., at 9-10.)  After ProxyMed

20

announced its adoption of the Mark on December 5, 2005, it immediately began using the Mark nationally in connection with its claims processing service.  (Mitchell Cert., Ex. 1, Lettko Decl., at ¶ 8.)  Accordingly, ProxyMed's extensive marketing and re-branding campaign has likely saturated the public's awareness with respect to its Mark.  Therefore, a comparison of the Mark's commercial strength with the Registered Mark's commercial strength suggests that confusion is likely here.

### c.  Expected Care and Attention of Consumers

Confusion is not considered likely "when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions."  Kos Pharm., Inc., 369 F.3d at 715.  When both professionals and the general public are the relevant consumers, the standard of care exercised is assumed to be that of the least sophisticated consumer in the class.  Id. at 716.

MedAvante says that it provides communications, data analysis, and other services to pharmaceutical companies, doctors, and others in the medical field that conduct clinical trials.  (Pl. Br., at 1.)  According to ProxyMed, ProxyMed's customers are generally pharmacies, laboratories, medical providers, and payer organizations, while MedAvante's customers are primarily global pharmaceutical companies such as Eli Lilly, Pfizer, and AstraZeneca.  (Def. Br., at 4.)  Nevertheless, although doctors and other medical providers are perhaps not

MedAvante's <u>customers</u>, they are essential to MedAvante's business because they decide whether MedAvante may use their facilities to conduct studies, and they supply patients to participate in the studies.  (Pl. Br., at 18.)  Thus, we find that MedAvante cannot conduct its business without the cooperation and permission of the medical providers, and it will not receive such cooperation if the medical providers do not view MedAvante positively.  (Id. at 4, 18.)

Medical providers are sophisticated consumers, who exercise considerable care in evaluating products and services.  However, "[t]here is no reason to believe that medical expertise as to products will obviate confusion as to source or affiliation or other factors affecting good will."  Kos Pharm., Inc., 369 F.3d at 717; see Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 596 (5th Cir. 1985) (explaining that likelihood of confusion may be found despite sophisticated consumers, if infringer's use of plaintiff's mark results in confusion as to either origin of plaintiff's products or plaintiff's connection to products).  Accordingly, we find that although this factor does not weigh in favor of MedAvante due to the relevant consumers' sophistication, it also does not weigh heavily in favor of ProxyMed because consumer sophistication as to products does not obviate the possibility of other types of confusion.  See Kos Pharm, Inc., 369 F.3d at 717 (concluding that

22

district court did not err in holding that "consumer care" factor did not weigh in favor of plaintiff due to consumer's expertise, but also concluding that it did not weigh heavily for defendant because expertise as to products does not obviate possibility of confusion as to source or affiliation).

### d.   Channels of Trade, Advertisements, and Targets of Sales Efforts

"The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." Id. at 722. This is a fact-specific inquiry that involves examination of the media the parties use to market their products and services, as well as the manner in which the parties use their sales forces. Id. Further, there is a greater likelihood of confusion if the parties target their sales efforts at the same customers. Id. Neither customer sophistication nor the relationship of the goods and services at issue is relevant in determining whether they are marketed through the same channels, advertised through the same media, or targeted at the same consumers because other Lapp factors take those considerations into account. Id. (rejecting argument that customer sophistication or relationship of goods is relevant to determining marketing, channels-of-trade, and target-of-sales factors because such argument impermissibly conflates different Lapp factors).

MedAvante provides communications, data analysis, and other services to pharmaceutical companies, doctors, and others in the

23

medical field.  (Pl. Br., at 1.)  MedAvante's customers are
primarily global pharmaceutical companies such as Eli Lilly,
Pfizer, and AstraZeneca.  (Def. Br., at 4.)  In contrast,
ProxyMed's customers are generally pharmacies, laboratories,
medical providers, and payer organizations.  (Id.)  ProxyMed
argues that it and MedAvante are in separate markets and deal
with completely different customer bases in different manners.
(Id. at 29.)  This Court disagrees.  ProxyMed and MedAvante are
both members of the healthcare industry, and both frequently come
into direct contact with doctors in hospital and office settings.
As discussed above, although doctors and other medical providers
are not MedAvante's direct customers, they are essential to
MedAvante's business because they decide whether MedAvante may
use their facilities to conduct studies, and they supply patients
to participate in the studies.  (Pl. Br., at 18.)  Thus, "it is
critical that the hospitals and individual physicians that are
potential sites [for MedAvante's studies] have a positive view of
MedAvante so that the fact that MedAvante is included in a
particular protocol will not lead to sites decline [sic]
participation in such clinical study."  (Id. at 22-23.)
Therefore, both ProxyMed's and MedAvante's advertising materials
target physicians, hospitals and other medical providers.

Neither party has explained the manner in which it uses its
sales forces and markets its products and services.

Nevertheless, we find that due to ProxyMed's national exposure and the large number of doctors with whom it conducts business or has an indirect relationship, ProxyMed's use of the Mark in its advertising and marketing materials will not only cause confusion but will likely usurp MedAvante's business identity.  Therefore, the factors involving marketing, advertising, and sales targets weigh in favor of confusion.

> **e.   Length of Time, Actual Confusion, Intent, and Relationship of Goods in Consumers' Minds**

MedAvante describes several situations where confusion is likely to occur.  (Id. at 19-21).  However, it does not offer any evidence demonstrating that actual confusion has occurred to date.  ProxyMed only began using the Mark nationwide on December 5, 2005, and thus, evidence of actual confusion may surface after more time has passed.  At present, however, this factor weighs in favor of ProxyMed.

MedAvante has similarly offered no evidence demonstrating that ProxyMed intended to promote confusion or appropriate MedAvante's prior good will.  See Fisons Horticulture, Inc., 30 F.3d at 479 (noting that relevant inquiry in likelihood of confusion case is whether defendant adopted mark "with the intent of promoting confusion and appropriating the prior user's good will").  The "intent to confuse" evidence changes in the reverse confusion context "from the deliberate intent to palm off or exploit the good will of the senior user's mark (deliberate

confusion), to the deliberate intent to push the senior user out of the market (reverse confusion)." Freedom Card, Inc., 432 F.3d at 479 (citations omitted).

ProxyMed concedes that it was aware of MedAvante's Registered Mark when it decided to adopt the Mark. (Def. Br., at 10.) ProxyMed explained that it considered the Registered Mark but did not believe it was an obstacle "due to the differences between the two marks, the distinctly different nature of [MedAvante's] services offered under the [Registered Mark], and the number of similar marks in both parties' respective fields." (Id. at 26.) MedAvante has not presented any evidence indicating that ProxyMed was careless in its evaluation of the likelihood of confusion between its Mark and MedAvante's Registered Mark. See Fisons Horticulture, Inc., 30 F.3d at 480; but see Freedom Card, Inc., 432 F.3d at 480 (noting that although Fisons implies that mere carelessness could weigh in plaintiff's favor in reverse confusion case, Third Circuit has not yet adopted "carelessness" as standard for analyzing intent to confuse). Therefore, this factor also weighs in favor of ProxyMed and against any likelihood of confusion.

The relationship of the products and services at issue is a neutral factor that does not weigh for or against confusion. "This factor focuses on the nature of the products themselves, asking whether it would be reasonable for consumers to associate

them or see them as related." Kos Pharm., Inc., 369 F.3d at 723. MedAvante does not contend that ProxyMed's products and services are so similar to its own products and services that a consumer could assume they were offered by the same source. Instead, MedAvante contends that if ProxyMed is permitted to continue using the Mark, MedAvante's customers "will come to believe that the unique services provided by MedAvante are actually being provided by the entity that these customers are more familiar with, ProxyMed." (Pl. Br., at 23.) Thus, the relationship-of-the-goods factor is not applicable or helpful here. See Kos Pharm., Inc., 369 F.3d at 711-712 (noting that Lapp test is not mechanistic, and if district court finds that certain of its factors are inapplicable or unhelpful in particular case, that court should explain its choice not to employ those factors).

### f.    Other Factors

MedAvante does not raise any additional factors indicating that the consuming public might conclude that ProxyMed is the party offering MedAvante's services or that ProxyMed is likely to manufacture a product in MedAvante's particular market. Instead, in addressing the tenth Lapp factor, MedAvante simply reiterates that ProxyMed's marketplace dominance, as well as the fact that ProxyMed's Mark is virtually identical to MedAvante's Registered Mark, weigh in favor of finding that confusion is likely. Because these arguments were addressed supra, the Court will not discuss them again.

### g.   Balancing the Factors

This Court finds that MedAvante has established the likelihood of confusion here.  The most important factor, the degree of similarity between MedAvante's Registered Mark and ProxyMed's Mark, weighs heavily in favor of finding that the likelihood of confusion exists.  Further, the Registered Mark is both commercially strong and inherently distinctive, and thus, deserves broad protection.  The factors involving marketing, advertising, and sales targets also weigh in favor of confusion.

The care-and-attention-of-consumers factor weighs against MedAvante because the relevant consumers are sophisticated, but this factor does not weigh heavily in favor of ProxyMed because consumer sophistication does not obviate the possibility of confusion as to source or affiliation.  Additionally, actual confusion and ProxyMed's intent weigh against finding a likelihood of confusion.  Nevertheless, upon balancing all the applicable factors, this Court finds that ProxyMed's use of the Mark is likely to create confusion concerning the origin of MedAvante's products and services, particularly in light of the degree of similarity between it and MedAvante's Registered Mark.

### B.   Irreparable Injury

"Once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury."  Id. at 726.  Thus, "trademark infringement amounts to irreparable injury as a matter

28

of law." Id.  As discussed supra, MedAvante has demonstrated a reasonable likelihood of success on the merits with respect to its claims by showing, inter alia, that ProxyMed's use of the Mark is likely to create confusion concerning the origin of MedAvante's products and services.  Therefore, it is presumed that MedAvante will be irreparably harmed if ProxyMed is permitted to continue using the Mark.

### C.   Harm to ProxyMed

ProxyMed asserts that granting the preliminary injunction would cause it significant injury because (1) its chosen Mark would be lost forever, and (2) the delay and expense of conducting another re-branding would damage its current business, prospects for future business, and the general confidence of its customers and employees.  (Def. Br., at 34.)  ProxyMed further asserts that an injunction would adversely affect its partners and vendors in co-marketing campaigns and communications, and thus, its partnership efforts would be irreparably harmed by another change in its corporate mark. (Id.)

Much of this alleged harm, however, is compensable by money damages if MedAvante does not prevail on its claims.  See Kos Pharm., Inc., 369 F.3d at 727 ("Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it.").  Specifically, the costs in time and money associated with adopting a new mark are injuries that can be remedied by

money damages.  Id. at 728.  Moreover, any injury ProxyMed may suffer is discounted by the fact that it brought the injury upon itself when it took a risk and deliberately proceeded with its re-branding effort despite knowing that its Mark was very similar to MedAvante's Registered Mark.  Id. at 728-29 (explaining that defendant took deliberate risk when it proceeded despite being warned that its mark was dangerously close to mark of competitor).  Therefore, as MedAvante has shown a likelihood of success on the merits, the Court, after balancing the harms between the two parties, concludes that granting the injunction would not harm ProxyMed more than denying the injunction would harm MedAvante.  See id. at 729 (recognizing that "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor").

### D.  The Public Interest

The basic public interest implicated in nearly all Lanham Act cases is "the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy."  Id. at 730.  Accordingly, because this Court has concluded that ProxyMed's continued use of the Mark creates a likelihood of confusion with respect to MedAvante's Registered Mark, the public interest in prevention of confusion is best served by prohibiting ProxyMed from continuing to use the Mark. See id. (opining that because likelihood of confusion is created

by use of confusingly similar marks, "it follows that if such use continues, the public interest would be damaged").   Therefore, the public interest favors injunctive relief here.

### CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant the motion, and (2) enjoin ProxyMed until the time of trial from directly or indirectly using the Mark.  The Court will issue an appropriate order.

      s/ Mary L. Cooper

**MARY L. COOPER**
United States District Judge

31